UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| MIRACLE RESTAURANT GROUP, LLC | : | Case No. 24:11158 |
| Debtor | : | Subchapter V |

### DECLARATION OF DONALD MOORE I IN SUPPORT OF DEBTOR'S EMERGENCY FIRST DAY MOTIONS

I, Donald Moore, declare as follows:

1. I have personal knowledge of the matters set forth herein, and, if called upon as a witness to testify thereto, I could and would competently so testify to those matters, except as to those matters expressly stated to be made on information and belief.

2. I am a Manager, Member of Miracle Restaurant Group, LLC ("Debtor").

**A.** **Background of the Debtor and the Chapter 5 Filings**

3. Debtor is a limited liability company (Non-Louisiana) domiciled in Delaware with its principal places of business located in Covington, Louisiana.

4. The Debtor was formed in 2005 and has been operating Arby's restaurants for its entire existence. The Debtor currently owns and operates twenty-five (25) Arby's restaurants throughout Illinois, Indiana, Texas, Mississippi, and Louisiana ("Franchise Restaurants") pursuant to various franchise and related agreements (the "Franchise Documents") with Arby's Franchisor, LLC ("Arby's"). Each location has separate Franchise Documents; however, all Franchise Documents are cross defaulted to other Franchise Documents where Donald Moore is the manager, member.

5. In 2010 the Debtor operated over 60 stores and filed for relief under Chapter 11 in this Court. A plan was confirmed and pursuant to the Plan, a number of stores were closed. The plan was consummated and all creditors were paid in full under the Plan.

6. The Debtor has leases for each Arby's location and does not own any immovable/real property.

7. I am the managing member of the Debtor and have experience in senior officer roles at public and private restaurants since 1990.

8. Beginning with the COVID pandemic, the Debtor experienced inflationary pressures in both commodity and labor expenses that price increases could not compensate for. This resulted in significant erosion in the variable cash earned from operations to cover the fixed costs of rent and debt service.

9. The Debtor has attempted to sell its Texas and Illinois (including Indiana) markets however it was unsuccessful in part due to certain stores in the Texas and Illinois markets that had a negative EBIDA and reduced the interest in the markets.

10. In 2023 and the first half of 2024, the Debtor has experienced negative same store sales that have further compressed the profit margin available to cover fixed costs. The Debtor has also been disappointed in store sales for certain of its newer restaurants that were developed and opened over the last three years. The negative same store sales and lower than anticipated sales from newer stores have resulted in certain stores that operate at extremely low or (at times) negative cash flow on a weekly and monthly basis.

11. The Debtor's working capital has been further hampered by significant delays in its receipt of tax refunds from the Internal Revenue Service. The Debtor filed for Employee Retention Tax Credits ("ERTC") refunds for each of the quarters ending March 31, 2021, June 30,

2021, and September 30, 2021, from the Internal Revenue Service in February of 2023 that total prior to review $3,540,980. At the date of its voluntary Chapter 11 petition, these refunds have not been reviewed nor paid by the Internal Revenue Service. The failure to have timely received these refundable tax credits have also contributed to the Debtor's decision to file its voluntary petition.

12. The Debtor, to help offset the trend in negative sales and lower operating margins approached both its landlords and Arby's for relief. Their requests and responses have not been enough to prevent the Debtor from having to seek bankruptcy protection. Additionally, the Debtor has explored selling certain of its restaurants in Texas and in the greater Chicago-land area, but overall declines in Arby's system-wide same store sales and low sales to fixed cost ratios of certain of the Debtor's restaurants have hampered efforts to secure offers.

13. In September 2023, the Debtor sold three of its stores located in Indiana and used the proceeds to pay down its notes with First Franchise Capital Corporation ("FFCC"), the LH Mortgage, and the U.S. Small Business Administration ("SBA"). The Debtor's remaining two stores in Indiana remain operating.

14. The Debtor intends to continue to market and sell its seven Texas Stores, eight Illinois Stores and two remaining Indiana Stores through the Bankruptcy Process, and to focus on its Louisiana and Mississippi Stores. To accomplish this, the Debtor has retained Peak Franchise Capital, LLC as financial advisor to assist in marketing the Debtor's stores.

15. Debtor has 322 employees, 31 of whom are on a full-time basis, and 291 of whom are on a part-time basis.

16. The Debtor's primary source of cash is derived from the day-to-day business operations of the Franchise Restaurants. In order for business operations to continue uninterrupted

and to generate funds in support of the overall reorganization strategy, the Debtor must be able to continue to use the cash generated daily from such business.

17. A lien search was conducted for the Debtor in Louisiana and Delaware and the results reflected liens on the Debtor's cash collateral in favor of FFCC, the SBA, McLane Foodservice Distribution, Inc. ("McLane"), Woodvine Partners, LLC ("Woodvine" and collectively, "Non-Insider Secured Parties"). The claims asserted can be described as follows:

   a. The Debtor and FFCC entered into a Master Loan Agreement, effective November 29, 2018. FFCC filed a UCC-1 in Delaware on November 29, 2018, and another UCC-1 on November 8, 2023.

   b. SBA provided an EIDL Loan dated December 1, 2021, in the principal amount of $200,000.00, which was increased to $499,500.00 through a First Modification of Note dated January 7, 2022. The SBA filed a UCC-1 Financing Statement in Louisiana on December 15, 2021 (File # 26-412200), granting the SBA a lien on the Debtor's cash collateral. The SBA also filed a UCC-1 in Delaware on February 15, 2024.

   c. McLane provides food deliveries to the Debtor's various restaurant locations. To secure payment for those deliveries, McLane filed a UCC-1 in Delaware against the Debtor on October 26, 2023, granting it a security interest over the Debtor's cash collateral, among other things.

   d. On December 5, 2023, the Debtor executed a Subordinate Promissory Note (the "Woodvine Note") to Woodvine in the principal amount of $750,000.00 and a maturity date of June 30, 2024. The Woodvine Note states "Notwithstanding anything to the contrary contained herein or in any other Loan Document, this

Note shall be subordinate in rank, preference and priority to all obligations, indebtedness and liabilities of Borrower [Miracle] to First Franchise Capital Corporation." Through a contractual agreement, Woodvine has a contractual subrogation agreement with FFCC, giving Woodvine a subordinated interest in the FFCC collateral. The Woodvine Note proceeds were used to provide needed cash to the Debtor due to the delayed ERTC funds.

B. **Extension of Time to File Schedules and Statements of Financial Affairs**

18. The Debtor has a limited staff who can work on the schedules that are required to be filed. In addition to the reporting duties occasioned by the Subchapter V filing, the Debtor and its accounting staff also must run and provide accounting support for the operating restaurants.

19. The Debtor and Debtor's proposed counsel have been devoting substantial time and effort to organizing information necessary for the petition and for preparation of numerous first day motions, and additional urgent motions are anticipated in the early stages of this case.

20. Given the numerous other pleadings the Debtor is filing, and those it has yet to file, and compliance requirements of Office of the U.S. Trustee, the Debtor needs additional time to complete and file its Schedules of Assets and Liabilities (the "Schedules"), Statements of Financial Affairs (the "SOFAs"), and any other documents required to be filed pursuant to any Case Management Deficiency Notices or other similar notices issued by the Court (collectively with the Schedules and SOFAs, the "Required Documents").

21. The Debtor does not believe that the extension of time materially prejudices the rights of any party. On balance, affording the Debtor sufficient time to file the Required Documents will likely alleviate the necessity of future amendments, and hopefully avoid additional expenditure of unnecessary administrative expenses incurred in connection with same.

22. To prepare the Required Documents, the Debtor must compile information from books, records, and documents relating to the claims of the Debtor's numerous creditors, as well as the Debtor's many assets and contracts. This information is extensive, and collecting it requires an enormous expenditure of time and effort on the part of the Debtor, its employees, and its professionals.

23. Since the filing of its petition, the Debtor has been working toward complying with its various bankruptcy related obligations and those mandated by the United States Trustee.

24. The need for the requested extension is not the result of a lack of due diligence on the part of the Debtor or its proposed counsel.

25. The Debtor is working diligently to prepare the Required Documents. However, due to the amount of work necessary to complete the Required Documents, and the time needed to assist in other matters critical to the Debtor's reorganization efforts, the Debtor requires additional time beyond the required fourteen (14) day period to complete the Required Documents properly and accurately. The Debtor anticipates that it will need at least twenty-one (21) additional days to complete the Required Documents.

    **C.**     **Cash Collateral**

26. The Debtor needs to use "cash collateral" to operate its restaurants. The cost centers range from purchasing food and other goods, employee costs, garbage, light and power costs and other costs that are incurred daily to operate the restaurants. As outlined above, the applicable liens of record are in favor of FFCC, SBA, McLane f/k/a Meadowbrook Meat Company, Inc, and Woodvine,

27. The Debtor's ability to pay its employees and to otherwise maintain its day-to-day operations without disruptions is essential to the continued viability of the business and the Debtor's

ability to reorganize. Hiring and retaining qualified employees have been particularly challenging during and since the pandemic, and the ability to continue to meet payroll on a timely basis is critical to the Debtor's ability to retain its workforce. The Debtor's need to use cash collateral is both critical and immediate, and, in the absence of authorization to use cash collateral, there will be serious and irreparable harm to the Debtor, its estate, its employees, and the Debtor's ability to reorganize.

28. The Debtor's use of cash collateral is necessary both to preserve the going concern value of the business and to reduce post-petition administrative expense claims against the Debtor, issues that are vitally important to a successful reorganization.

29. The Debtor has developed cash flow projections reflecting anticipated revenue and expenditures from the Petition Date for an initial four-week period, which are contained in proposed Interim Budgets (the "Interim Budgets," true and correct copies of which have been submitted with the Debtor's Cash Collateral Motion). As set forth in the Interim Budgets, the Debtor seeks authority to use cash on hand as of the Petition Date together with funds generated from the post-petition operation of the Franchise Restaurants. The Debtor will seek to renew its use of cash collateral on four-week intervals with new four-week budgets provided prior to the next cash collateral hearing.

30. The Debtor has an immediate need for the use of asserted cash collateral to maintain its business operations. The Debtor's expected use of cash collateral during the interim period is reflected in the Interim Budgets. All payments described in the Interim Budgets are necessary to maintain and continue the Debtor's operation and to preserve its going concern value for the benefit of the Debtor's creditors. Significantly, the Debtor must remain current in its payments to Arby's under the Franchise Documents, as the loss of its franchise rights would cause irreparable damage to the Secured Parties' collateral. Additionally, the Debtor must have access to cash collateral to make payments to its employees and vendors for post-petition goods and necessary services,

including, among others, food and related supplies, rent, utilities, payroll, payroll tax, sales and other taxes, insurance, and other operating expenses and pertinent, ordinary expenses of its business. Failure to make payments in accordance with the Interim Budgets would likely result in the cessation or interruption of the Debtor's business, causing immediate and irreparable harm to its estate. Put simply, the Debtor cannot continue operation without the use of cash collateral, and if the Debtor is unable to operate, all parties will be harmed.

31. Although the Debtor does not concede or agree that all of the cash generated by the Franchise Restaurants is the cash collateral of the Non-Insider Secured Parties, the Debtor seeks to use cash derived from the business operations on an interim basis, in accordance with the Interim Budgets. The Debtor further seeks final use of cash collateral in accordance with the budget to be filed prior to the final hearing.

32. Inasmuch as the proposed expenditures are projections, there may be some variation in the categories of expenditures as well as unanticipated expenses, particularly on an interim basis. For example, it is not possible to predict at this time the effect, if any, that this Subchapter V filing may have on the Debtor's business in the short term, although little, if any, impact is anticipated. Therefore, on a monthly basis, the Debtor seeks authority to exceed the aggregate amount of the Interim Budget by twenty percent (20%). Further, the Debtor requests that they be authorized to apply any unused amount in one category for each month to any other category on a cumulative basis.

33. The Debtor's business is seasonal, and while cash revenues are currently at a low point, it is expected to increase month by month as operations move into the summer months. Accordingly, by continuing to operate in the normal course, the Debtor anticipates that its cash collateral position will only improve, thereby improving the Debtor's overall going concern values.

34. The Franchise Restaurants are the Debtor's primary assets, and without the continuity of operations and an uninterrupted ability to conduct business, the Debtor could face significant customer defection, which would have an immediate and devastating effect upon the Debtor's future revenues, creditors, employees, and opportunity for reorganization.

35. If the Debtor do not have access to cash to pay its operating expenses, even for a short amount of time, it will, in all likelihood, be forced to shut down, which would irreparably harm its fair value. As such, the use of cash collateral (including all cash existing on the Petition Date plus all post-petition revenue generated) to conduct the Debtor's business will not only preserve and protect the value of the Non-Insider Secured Parties' collateral generally—thus providing the Non-Insider Secured Parties with adequate protection of their interests—it will enhance and maximize the potential recovery for all creditors of the Debtor's estate.

D. **Utilities**

36. Uninterrupted utility services during the reorganization are vital to operation of the Franchise Restaurants and preservation of the going concern value of the Debtor's business. In addition, implementation of orderly procedures for utility companies is essential to cash flow and vitally important to the success of the reorganization.

37. In connection with the operation of its business, the Debtor obtains water, sewer service, waste disposal, natural gas, electricity, telecommunications, internet access and service, and other similar services (collectively, the "Utility Services") from a number of utility providers (the "Utility Provider(s)"). A nonexclusive list of the Utility Providers and their affiliates that provide Utility Services to the Debtor as of the Petition Date is attached to the Debtor's Utility Motion. The relief requested therein is requested with respect to all Utility Providers providing Utility Services to the Debtor, regardless of whether they are included in the Debtor's Utility Motion.

38. Preserving Utility Services on an uninterrupted basis is essential to the Debtor's business operation. The Debtor's business includes multiple operating restaurant locations. These locations require electricity, telecommunications, internet, water, waste management, and other utility services to operate.

39. Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtor's business operations would be disrupted, which could jeopardize the Debtor's ability to effectively reorganize. Accordingly, it is essential that the Utility Services continue uninterrupted during this Bankruptcy Case.

40. The Debtor intends to pay post-petition obligations to the Utility Providers in a substantially timely manner consistent with ordinary course practices.

E. **Employee Matters**

41. The Debtor has filed *Debtor' Expedited Motion for Entry of an Order* (i) *Authorizing the Debtor to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs and (ii) Granting Related Relief* (the "Wage Motion").

42. By way of the Wage Motion, the Debtor seeks entry of an Order authorizing the Debtor to pay Employee Obligations, as defined in the Wage Motion, and directing JP Morgan Chase to honor any payments for the Employee Obligations.

43. The relief requested in the Wage Motion is necessary to avoid irreparable harm and is appropriate because operations of the Debtor is labor intensive and require the labor and services of its current employees in order for business operations to continue uninterrupted and to generate funds in support of the overall reorganization strategy. In summary, the Debtor's recent pay period

ended on June 9, 2024 (the "Pre-Pay Period"), and all current employees are due their earned wages from that period.

44. Without satisfying the Employee Obligations (as defined in the Wage Motion), the Debtor may lose valuable employees, causing a detrimental interruption in the Debtor's operation. Furthermore, given the current economic conditions and the inflationary labor market, replacing employees at this time could be difficult if not impossible. Moreover, the failure to receive timely paychecks will result in extreme hardship to employees.

45. The relief sought in the Wage Motion is necessary to avoid irreparable harm, to allow continued operations, and to facilitate achieving the reorganizational goals of this Subchapter V case.

46. Accordingly, the Debtor seeks authorization to pay outstanding Employee Obligations as set forth in the Wage Motion, and to continue Employee Benefits and pay Employee Benefit Obligations as also set forth in the Wage Motion. The Debtor also seeks authorization to continue the Miscellaneous Benefit Programs as to pay the Miscellaneous Benefit Obligations as set forth in the Wage Motion.

47. The Debtor's 322 full and part time employees perform a variety of critical functions, including management, administration, maintenance, finance and accounting, human resources, safety, security, procurement and preparation of food related items for ultimate delivery to consumers, and other areas crucial to the Debtor's business. The employees are fundamental to the success of the Debtor's business and continued operation and, as a result, critical to this Subchapter V case and the Debtor's reorganization efforts. The Debtor estimates that, as of the Petition Date, the aggregate amount of its unpaid Employee Obligations is approximately $279,492.00.

48. The Debtor also has certain Unpaid Reimbursable Expenses as defined in the Wage Motion that the Debtor estimates to total $4,960.00. These Unpaid Reimbursable Expenses accrued prepetition.

49. The Debtor pays employees' salaries, wages and other compensation (including overtime pay) in exchange for services they provide (the "Compensation Obligations). As of the Petition Date, the Debtor estimates that the aggregate amount of unpaid Compensation Obligations accrued prepetition related to the Pre-Pay Period totals.

50. The Debtor is not seeking authority to pay to any individual any amount in prepetition Compensation Obligations that would exceed the statutory priority cap imposed by Section 507(a)(4) of the Bankruptcy Code.

51. The Debtor uses Netchex to administer payroll for employees and provide related payroll processing, payroll tax reporting, time entry systems, payment preparation, payroll transfer administration and other reporting and administrative services (the "Payroll Processing Obligations").

52. As employers, the Debtor is required by law to withhold from certain employees' salaries, wages, and other compensation amounts related to federal, state, and local income taxes, as well as Social Security and Medicare taxes (collectively, the "Withholding Taxes") and to remit them to the appropriate taxing authorities (collectively, the "Taxing Authorities"). The Debtor is also required to make payments from its own funds on account of Social Security and Medicare taxes and to pay, based on a percentage of gross payroll (and subject to state-imposed limits), additional amounts to the Taxing Authorities for, among other things, state and federal unemployment insurance (collectively, the "Employer Payroll Taxes" and, together with the Withholding Taxes, the "Payroll Tax Obligations").

53. As of the Petition Date, the Debtor estimates that it owes approximately $72,660.00 in Payroll Tax Obligations relating to the prepetition period.

54. The Debtor also processes child support garnishments owed by various Employees as part of the Employee Obligations. Accordingly, the Debtor seeks authorization to process the Employees' Child Support Garnishments as part of the relief sought herein.

55. In addition to the aforementioned payment-related obligations, the Debtor maintains various employment benefit plans and policies for its employees, including health care, vision, dental, and other miscellaneous benefit programs (collectively, the "Employee Benefits", and the obligations related thereto, the "Employee Benefit Obligations"). Participation in the Employee Benefits is at the discretion of each individual employee and varies based on their participation therein.

56. Medical, dental, vision, and other health care benefits (collectively, the "Health Care Benefits") are available to eligible employees of the Debtor. The Health Care Benefits of employees' and the Debtor's contributions (the "Health Care Benefit Obligations") are set forth in the Wage Motion.

57. The Debtor also maintains additional Employee Benefits including, payment to employee's garnishments, disability insurances, life insurances, and telephone programs which are all funded entirely by "after-tax" employee contributions (collectively the "Miscellaneous Benefit Programs"). The Debtor also seeks authorization to continue to operate and administer the Miscellaneous Benefit Programs as part of the Employee Benefit Obligations.

58. The Miscellaneous Benefit Obligations are funded exclusively by employee contributions but are administered by the Debtor.

### F. Customer Practices Motion

59. The Debtor has filed a Customer Practices Motion to allow the Debtor to honor gift cards and discount coupons. If the Debtor does not honor either gift cards or discount coupons the Debtor will lose customer support and issues will exist throughout the Arby's system nationwide. Debtor's gift card exposure is less than $20,000.00 and the exposure on the discount coupons is unknown since most discount coupons are issued by Arby's on a national basis with some issued locally by the Debtor.

### G. Critical Vendor Motion

60. The Debtor has filed a Critical Vendor Motion. The parties on the list are comprised primarily of two groups. The first group consists of food suppliers who supply the raw materials that make up the products sold to customers. The Debtor needs immediate granting of critical vendor status to Sygma, McLane. and Perfection Bakery. The existing terms for each of these vendors is less than 20 days and, as such, each has a reclamation claim entitled to priority status under 11 U.S.C. §§ 503(b)(9) 507(a)(2). Further, Sygma and McLane have PACA claims, which are claims that allow each to achieve super lien status.

61. The second group consists of vendors and advertising groups. The vendors are approved and required Arby's vendors. The advertising groups is necessary for the Debtor to advertise its products in the relevant market. The fast food industry has been described as "advertising reflective" and no advertising is the easiest means to ensure reduced sales.

62. I declare, under penalty of perjury, pursuant to the laws of the United States of America, that the foregoing is true and correct, and that this declaration was executed on June __, 2024 in Covington, Louisiana.

/s/ *Donald Moore*  
**Donald Moore**

{00382038-4} 14

Respectfully submitted:

*/s/Michael E. Landis*
Douglas S. Draper, La. Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com
Michael E. Landis, La Bar No. 36542
mlandis@hellerdraper.com
Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130
Telephone: (504) 299-3300
Fax: (504) 299-3399

***Proposed Counsel for Debtor and Debtor in Possession***

{00382038-4} 15